NOT FOR PUBLICATION                                        (Doc. Nos. 58, 59, 60)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____      :
                                         :
CHRISTINE MARCUCCI and                   :
LAURA GURLING, co-adminstrators          :
ad prosequendum of the Estate of         :
Marie Marcucci, deceased,                :
                                         :
                    Plaintiffs,          :        Civil No. 09-1449 (RBK/KMW)
                                         :
             v.                          :        **OPINION**
                                         :
ANCORA PSYCHIATRIC HOSPITAL,             :
et al.,                                  :
                    Defendants.          :
_____      :

**KUGLER**, United States District Judge:

This matter comes before the Court on the motions of Ancora Psychiatric Hospital ("Defendant Ancora") and the State of New Jersey, Anifatu Kargbo ("Defendant Kargbo"), and Ann Marie Wanner ("Defendant Wanner") for summary judgment on the claims of Christine Marcucci and Laura Gurling, co-administrators of the Estate of Marie Marcucci ("Plaintiffs" or "Estate"). Because the Court finds that Defendant Ancora and the State of New Jersey are immune from suit in this Court, the Court grants their unopposed motions for summary judgment. Furthermore, because the Court finds that the actions of Defendants Kargbo and Wanner do not shock the conscience, their summary judgment motions on Plaintiffs' civil rights claim will be granted, as will Defendant Kargbo's motion for summary judgment on Plaintiffs' claim for punitive damages.

## I.    BACKGROUND

Marie Marcucci, now deceased, was an involuntarily committed resident at Ancora Psychiatric Hospital, suffering from schizoaffective disorder, bipolar type.  Compl., ¶¶ 12-13. Because Ms. Marcucci had been designated to be at high risk for choking on food, her physician at Ancora ordered that she be placed on a puree-only diet, and that she "receive arms-length supervision whenever she ate anything," in May 2007.  Id. at ¶¶ 14-16.  Nevertheless, Plaintiffs allege, on March 24, 2008, a snack cart containing solid foods entered the building where Ms. Marcucci was housed, and Ms. Marcucci was given a candy bar from the cart.  Id. at ¶¶ 17-18. Ms. Marcucci choked while attempting to ingest the candy bar, Plaintiffs claim, because she "did not receive appropriate arms length supervision while consuming the candy bar, such that the orderly/healthcare worker assigned to monitor her[] failed to present her from consuming the candy bar and failed to timely clear her airway once Ms. Marcucci began choking.  Id. at ¶¶ 19-20.  Plaintiffs further allege that "there was a substantial delay in clearing [Ms. Marcucci's] airway," causing her "to suffer from air hunger[ and] respiratory distress," as well as organ and tissue injury, pain and suffering, mental anguish, "anoxic brain injury," and Ms. Marcucci's death on April 1, 2008.  Id. at ¶¶ 21-23, 25.

The Estate alleges that Ms. Marcucci's death "was the direct and proximate result of the negligent, reckless deliberately indifferent conduct" of Defendants in failing to monitor or supervise Ms. Marcucci, allowing her to access and consume a candy bar despite her diet, failing to timely clear her airway once she began choking, and failure to properly train employees on how to deal with such an emergency.  Id. at ¶ 24.  Moreover, Plaintiffs allege that Ms. Marcucci's injuries and damages are the result of Defendants' "negligent, reckless, deliberately indifferent, outrageous and wrongful conduct."  Id. at ¶ 25.  As a result, Plaintiffs bring a claim

for relief under 42 U.S.C. § 1983 (Count 1), indicating that Ms. Marcucci's "constitutional rights to medical care while in the state's custody" and her Fifth and Fourteenth Amendment rights to substantive due process  were violated.  Plaintiffs also bring claims of negligence against all Defendants (Count 2).  For both Counts of the Complaint, Plaintiffs seek damages and costs of suit recoverable under N.J.S.A. 2A:15-3, damages and costs of suit that Ms. Marcucci herself would have recovered had she lived, damages under the New Jersey Wrongful Death Act, funeral and other expenses incurred on Ms. Marcucci's behalf, punitive damages, damages recoverable under 42 U.S.C. § 1983, and any other damages and/or relief this Court or a jury finds equitable.  Compl.

Defendants Ancora Psychiatric Hospital and the State of New Jersey, Anifatu Kargbo, and Ann Marie Wanner bring individual motions for summary judgment on Plaintiffs' claims.

## II.    STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'— that is, pointing out to the

district court—that there is an absence of evidence to support the nonmoving party's case."
Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A. Summary Judgment Motion of State of New Jersey

Defendant New Jersey moves for summary judgment on Plaintiffs' claims because, it argues, the State of New Jersey has sovereign immunity from suit in this Court under the Eleventh Amendment to the U.S. Constitution.  Defendant New Jersey's motion is unopposed.

4

Indeed, the Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the kind of relief sought.[1]  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).  Because nothing in 42 U.S.C. § 1983 abrogates a state's Eleventh Amendment immunity, and because Plaintiffs have not presented evidence to suggest that New Jersey has consented to suit in this Court, Eleventh Amendment immunity bars Plaintiffs' claims against the State of New Jersey.  See Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).  Accordingly, the Court grants summary judgment to Defendant New Jersey on both counts of the Complaint.

**B. Summary Judgment Motion of Defendant Ancora Psychiatric Hospital**

Defendant Ancora Psychiatric Hospital moves for summary judgment on Plaintiffs' claims because, Defendant Ancora argues, Plaintiffs' suit against it is also barred by the Eleventh Amendment.  Defendant Ancora's motion for summary judgment is unopposed.

N.J.S.A. 30:4-160 indicates that "[t]he New Jersey State Hospitals, designated in R.S.30:1-7 as psychiatric hospitals, shall include the existing buildings and lands of Ancora Psychiatric Hospital . . . ."  It has previously been held within this District that, because Defendant Ancora was created by statute and is "operated by the Department of Human Services, which is 'a principal department in the Executive Branch of the State Government,' N.J.S.A. 30:1-2," Defendant Ancora is an "alter ego[] of the State of New Jersey for Eleventh Amendment purposes," and accordingly is immune from suit in federal court.  State of N.J.,

---

[1] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend XI.

Dept. of Envtl. Prot. v. Gloucester Envtl. Mgmt. Services, Inc., 923 F. Supp. 651, 660 (D.N.J. 1995) (JBS).[2]

### C. Summary Judgment Motion of Anifatu Kargbo

On March 24, 2008, Defendant Kargbo, a licensed professional nurse, was the medication nurse on duty at the time of Ms. Marcucci's choking. Plaintiffs allege that Defendant Kargbo violated Ms. Marcucci's constitutional rights under the Fifth and Fourteenth Amendments by acting with deliberate indifference to Ms. Marcucci's condition (Count 1 of the Complaint). Moreover, Plaintiffs allege that Defendant Kargbo's actions were negligent (Count 2 of the Complaint). Kargbo moves for summary judgment only on Count 1 of the Complaint.

The surveillance footage from the nurses' station at the time of the incident offers a view of the events leading up to Ms. Marcucci's choking, as well as the choking itself. Video, Channel 2, Ex. B, Def. Kargbo's Br. in Support of Summ. J. ("Def. Kargbo's Br."). The video shows Ms. Marcucci in a beige jacket and pink pants, holding a brown paper bag and a beverage, turning the corner in front of the nurses' station and coming into the view of the surveillance camera. Id. Ms. Marcucci then sits on the floor in front of the nurses' station with her legs stretched out in front of her, and proceeds to consume a beverage. She gets up and walks out of the view of the camera, and then returns, sits on the floor, and consumes more beverage. Id. After repeating the same general sequence several times, at about 6:18 PM, Ms. Marcucci appears to begin consuming solid food, and has difficulty swallowing. She seems to struggle to her feet, walks out of the frame, and reappears immediately to sit on the floor in front of the nurses' station, where she slumps over and lies on the floor. Id. at 6:20:24 PM. Several

---

[2] The court in Department of Environmental Protection v. Gloucester Environmental Management Services made this determination by analyzing the factors outlined by the Third Circuit in Fitchik v. New Jersey Transit Rail Operations, Inc. to determine whether an agency is a state agency: (1) whether the funds to pay a judgment would come from the state; (2) the agency's status under state law; and (3) the agency's degree of autonomy. 873 F.2d 655, 659 (3d Cir.).

individuals (presumably not hospital staff, since they do not appear to be implicated in this lawsuit) see Ms. Marcucci, and, at approximately 6:21:16 PM, Defendant Kargbo appears in a red sweater, approaches Ms. Marcucci, and then walks away to enter the nurses' station and is seen picking up the phone.  Id.  Defendant Kargbo testified that she initially came on the scene after having been alerted by a another patient that Ms. Marcucci was "on the floor turning blue." Deposition of Anifatu Kargbo ("Kargbo Dep."), Pls.' Br. in Opp. to Karbo's Summ. J. Motion ("Pls.' Br. Opp. Kargbo"), Ex. B, 36.  She further testified that, when she saw that Ms. Marcucci was on the floor and had vomited and defecated, Defendant Kargbo "ran into the nursing station, opened the door with the keys, called the code 66."  Id. at 36-37.  Plaintiffs do not appear to dispute that Defendant Kargbo called the code.  She then "ran to grab the crash cart through two steel metal doors, about 50 to 50 feet away."  Id. at 37.  The surveillance video confirms this. Video, Channel 5, at approximately 6:21:56 PM.

 On June 9, 2008, Ancora's Office of Cooperative Labor Relations issued a Disciplinary Action Request ("DAR") as a result of Ms. Marcucci's choking.  Pls.' Br. Opp. Kargbo, Ex. G. The DAR requested that Defendant Kargbo receive thirty days of suspension because, as "the first trained employee to arrive on the scene" of Ms. Marcucci's choking, Kargbo "failed to stay with the patient, do an assessment, and initiate first aid or CPR," and "left the patient and called for a code 66"—actions which constituted a violation of "EXEC policy 3.6 Medical Emergency Code 66, NURS 5.20 Code 66, NURS 5.23 Emergency First Aid."  Id.  Defendant Kargbo testified that, as a result of these events, she "received an agreement of 20 days suspension, no pay, no services, no benefits."  Kargbo Dep., 10.

Defendant Kargbo "disputes that her actions constitute a violation of the Fifth or Fourteenth Amendments," explaining that "[i]t is well-settled that claims of negligence or

medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"  Def. Kargbo Br., 10-11.  Defendant presumes, without explanation, that the "deliberate indifference" standard applies to this matter.  Moreover, the cases cited by Defendant Kargbo govern the context of <u>Eighth</u> Amendment[3] violations—specifically, cases in which prisoners claim relief under Section 1983, arguing that their Eighth Amendment rights have been violated because the inadequate medical treatment received in prison constitutes deliberate indifference to their right to be free from cruel and unusual punishment.

Plaintiffs do not appear to dispute that the deliberate indifference standard applies to this matter, but argue that Defendant Kargbo's actions rise to the level of wantonness required for a deliberate indifference violation.  In conceding that this standard governs their Section 193 claims, Plaintiffs appear to forget that they claim relief under Section 1983 for alleged violations of their <u>Fifth</u> and Fourteenth Amendment rights—not their Eighth and Fourteenth Amendment rights.

The Supreme Court has found that the same standard does not necessarily govern alleged violations of the Fifth and Eighth Amendments.  To begin with, "[w]hen a person is institutionalized—and wholly dependent on the State— . . . a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities."  <u>Youngberg v. Romeo</u>, 457 U.S. 307, 317, 102 S. Ct. 2452, 2461, 73 L. Ed. 2d 28 (1982).  Significantly, the <u>Youngberg</u> Court found, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  <u>Id.</u> at 321-22.  In <u>Youngberg</u>, the Supreme Court held that the district court had improperly instructed

---

[3] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

the jury at trial that "the proper standard of liability was that of the Eighth Amendment," in a case where a severely mentally retarded plaintiff alleged that the repeated injuries he suffered at a state hospital, to which he had been involuntarily committed, violated his Eighth and Fourteenth Amendment rights.  Id. at 325.

In this case, the Court applies the standard articulated for alleged violations of the Fifth and Fourteenth Amendments: whether or not the complained-of conduct shocks the conscience. In elucidating that standard, the Third Circuit has relied upon the Supreme Court's holding in County of Sacramento v. Lewis, 523 U.S. 833 (1998), wherein the Supreme Court held that "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory," so that "our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  County of Sacramento v. Lewis, 523 U.S. 833, 850, 118 S. Ct. 1708, 1718, 140 L. Ed. 2d 1043 (1998) (cited in Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000)). The Third Circuit has explained that Lewis "makes clear that a plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct 'shocks the conscience' in the particular setting in which that conduct occurred.  In some circumstances, conduct that is deliberately indifferent will shock the conscience."[4]  Nicini, 212 F.3d at 810.

The "exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case."  Id. (citing Lewis, 523 U.S. at 375 (internal quotation marks omitted)).  Nevertheless, the Court is satisfied that that high level is not met here.  Certainly, Defendant Kargbo breached the hospital's emergency procedures by "fail[ing] to stay with [Ms. Marcucci], do an assessment, and initiate first aid or CPR."  Pls.' Br. Opp.

---

[4] The Nicini Court pointed out that, for example, the deliberate indifference standard is generally cited in the foster care context, though courts "have defined that standard in slightly different ways."  Nicini, 212 F.3d at 810.

Kargbo, Ex. G.  However, instead of staying with Ms. Marcucci, Defendant Kargbo hurried to the nurses' station and called code 66 for emergency help, which quickly appeared.  Plaintiffs' characterization of Defendant Kargbo's action as "walk[ing] away" from a "critically ill patient laying in distress on the ground," "leaving the patient to suffer alone" is a glib assessment of what happened, since Defendant Kargbo left Ms. Marcucci in order to call an emergency code.  Pls.' Br. Opp. Kargbo, 14.  Defendant Kargbo's calling code 66 manifested an attempt to help Ms. Marcucci receive the aid she needed, and therefore obviates any genuine issue of material fact as to the conscience-shocking nature of Defendant Kargbo's action.

Plaintiffs point to the expert report of Marian Klepser, M.D., to indicate that Dr. Klepser found that "Nurse Kargbo was indifferent to the safety and welfare of Ms. Marcucci" because Defendant Kargbo did not follow hospital protocol, Pls.' Br. Opp. Kargbo, Ex. P; however, Kargbo's decision to call others for help in a highly pressurized situation—however mistaken— does not shock the conscience for the purposes of establishing a constitutional violation.  See Nicini v. Morra, 212 F.3d 798, 833 (3d Cir. 2000) (distinguishing between the actions of a social worker who had time "to make unhurried judgments" and one who did not "have the luxury of proceeding in a deliberate fashion" in applying the shocks-the-conscience standard) (internal quotations omitted).  Plaintiffs also indicate that the deposition testimony of Julissa Gaddis demonstrates that Defendant Kargbo's behavior was conscience-shocking.  Pls.' Br. Opp. Kargbo, 15; see also Dep. of Julissa Gaddis ("Gaddis Dep."), Ex. A, Pls.' Br. Opp. Kargbo.  For example, Ms. Gaddis indicated that, in a code situation, the "duties and responsibilities" of a "med nurse" such as Defendant Kargbo would be "[t]o get the the crash cart, assist the nurse, the charge nurse with anything she needs at that moment."  As the surveillance video shows, after going to the nurses' station to call the code, Defendant Kargbo did retrieve the crash cart with

Ann Marie Wanner, the charge nurse on duty at the time. Video, Channel 2, at approximately 6:22:13 PM; see also Video, Channel 5, at approximately 6:21:58 PM. Defendant Kargbo is also seen attempting to assist personnel as they aid the choking Ms. Marcucci. Video, Channel 2, at approximately 6:23 PM. Accordingly, despite the fact that Ms. Gaddis testified "[a]bsolutely not" in response to a question as to whether Defendant Kargbo retrieved the crash cart and assisted the charge nurse, Ms. Gaddis's testimony raises no genuine issue of material fact in light of what is plainly seen on the surveillance cameras. Gaddis Dep., 31. As the Supreme Court has held, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). Such blatant contradiction by the record will be demonstrated, the Supreme Court ruled, in a situation where a "videotape tells quite a different story" than the testimony offered by one party. Id. at 1775.

Furthermore, even assuming that Ms. Gaddis's testimony that Defendant Kargbo had placed her clipboard in front of the nurses' station to prevent patients on the outside from opening the window is to be believed, id. at 30, it is unclear from the surveillance videos how that action relates to the events leading up to and following Ms. Marcucci's choking, since the video does not show Ms. Marcucci attempting to open the window at any point. Moreover, it is unclear why such an action should shock the conscience. Nor does Ms. Gaddis's testimony that Defendant Kargbo "was pissed off that she was going to get in trouble" and was "throwing things around inside the nurse's station," instead of helping other personnel, id. at 32, create a genuine issue that Defendant Kargbo's behavior shocks the conscience in light of the actions that Defendant Kargbo indisputably did take—as shown on the surveillance video—in obtaining a

11

crash cart and calling the code.  Accordingly, the Court grants Defendant Karbo's motion for summary judgment on Count 1.

Defendant Kargbo has also moved for summary judgment on Plaintiffs' claim for punitive damages.[5]  The Third Circuit has held that "for a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous.  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard."  Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir.1989).  Plaintiffs argue that the evidence they have produced "indicates that Anifatu Kargbo's conduct was egregious and must be punished," namely because "Ms. Kargbo saw a patient in acute distress, . . . and simply abandoned the patient."  Pls.' Br. Opp. Kargbo, 17.  Because the evidence does not support an allegation of reckless or callous abandonment by Defendant Kargbo, the Court grants Defendant Kargbo's motion for summary judgment as to Plaintiffs' claim for punitive damages.

### D. Summary Judgment Motion of Ann Marie Wanner

Defendant Ann Marie Wanner was the charge nurse on duty when Marie Marcucci choked on March 24, 2008.  Gaddis Dep., 25; see also Def. Wanner's Br. in Support of Summ. J. ("Def. Wanner's Br."), 3.  Defendant Wanner passed away in October 2011, and Linda D'Andrea was named the Executor of Wanner's Estate.  Def. Wanner's Br. Summ. J., 5.  On January 31, 2012, a Consent Order was filed, amending the caption in this matter to reflect that D'Andrea, as Administrator of Wanner's Estate, should take the place of Wanner in the case caption.  Doc. No. 69.  For the purposes of elucidating the facts relevant this motion, the Court continues to refer to "Defendant Wanner," rather than to D'Andrea.

---

[5] Plaintiffs and Defendant Kargbo both improperly base their punitive damages arguments upon the New Jersey state law standard, namely N.J.S.A. § 2A:15-5.9 et seq., rather than federal law.

Like Defendant Kargbo, Defendant Wanner argues on summary judgment that Plaintiffs' Section 1983 claim fails as a matter of law because Plaintiffs do not point to evidence creating a genuine issue of material fact as to whether Defendant Wanner's actions meet the deliberate indifference standard.

As explained above, the Court applies the "shocks the conscience" standard (not the deliberate indifference standard, although, as indicated in Section III.C, there are situations wherein the two may overlap) to Plaintiffs' claims that Defendants violated their rights under the Fifth and Fourteenth Amendments.  Plaintiffs argue that Defendant Wanner's actions during the choking episode shock the conscience because, Plaintiffs claim, the surveillance video shows that "Nurse Wanner turns and runs away from Marie Marcucci within seconds of seeing her." Pls.' Br. Opp. Wanner, 5-6.  However, as described in Section III.C supra, the surveillance video clearly shows that Defendant Wanner runs away from Ms. Marcucci in order to retrieve a crash cart (along with Defendant Kargbo), and she returns with that cart and stays to assist in the delivery of emergency care to Ms. Marcucci.[6]  Video, Channels 2 and 5.

Plaintiffs further point out that, as with Defendant Kargbo, the State Investigation Report noted that, "[b]ased on the available evidence and documentation, the allegation of neglect, against Ann Marie Wanner, Registered Nurse, is substantiated."  Pls.' Br. Opp. Wanner, Ex. G (emphasis omitted).  However, this finding of neglect does not corroborate Plaintiffs' claim that Defendant Wanner's behavior shocks the conscience.  Even Ms. Gaddis's testimony that Defendant Wanner did not seem "in control" during Ms. Marcucci's choking, and that Wanner was "running through the hallway like a crazy woman, screaming, she was turning blue, with no purpose," does not create an issue of material fact as to whether or not Defendant Wanner's

---

[6] By contrast to what is seen on the video, Ms. Gaddis testified that Defendant Wanner "was running in the direction of the crash cart, but she never came back with it."  Gaddis Dep., Pls.' Br. Opp. Wanner, Ex. M, 27.

conduct shocked the conscience.  Pls.' Br. Opp. Wanner, Ex. M, 26.  Rather, Ms. Gaddis's

version of the events reinforces that Defendant Wanner was frantic precisely because she was

concerned for Ms. Marcucci, not unconcerned or malicious in a manner that would shock the

conscience.  This is entirely consistent with what is seen in the surveillance videos.

   Plaintiffs further argue that Defendant Wanner's supervision over her nurses and aides—

particularly regarding their training and scheduling—shocks the conscience.  Plaintiffs claim

that, because Defendant Wanner was the charge nurse, it was her "duty and responsibility to

make sure that someone was assigned to supervise Ms. Marcucci not only during meals, but for

visual observation as well."  Def. Wanner's Br., 3.  Ms. Marcucci was placed on "PVO," or

"periodic visual observations," which means that she was to be "within eye view at all times."

Id.; see also Dep. of Ann Marie Wanner ("Wanner Dep."), Pls.' Br. in Opposition to Def.

Wanner's Motion ("Pls.' Br. Opp. Wanner"), Ex. A, 107 (explaining that PVO "means you have

to be within an eye's range for her . . . at all times").  However, Plaintiffs indicate, Defendant

Wanner knew that Nurse Ennals, the nurse assigned to Ms. Marcucci, would be on break from

6:00 to 7:00 PM on the date of Ms. Marcucci's choking, and yet did not assign anyone to cover

Ms. Ennals's break.  Wanner Dep., 103-04.  Defendant Wanner testified that, although the

assignment schedule should have specified which nurse would cover Ms. Ennals "in black and

white and in ink," nevertheless Joseph Okafor, who was assigned responsibility for Ms.

Marcucci's food and snack intake, should have been watching Ms. Marcucci during that time.

Id.  An interview with House Staff Assistant ("HSA") Okafor, conducted on March 27, 2008,

appears to confirm this: "I was assigned Marie Marcucci for 1:1 meals + snacks.  I also was

assigned to watch PVO's . . . ."  Pls.' Br. Opp. Wanner, Ex. G.  Plaintiffs appear to argue that,

because HSA Okafor (also a named Defendant in this matter) was "nowhere to be found" when

Ms. Ennals went on break, Defendant Wanner's failure to assign a nurse to relieve Ms. Ennals creates a genuine issue of material fact as to the conscience-shocking nature of Defendant Wanner's conduct.  Pls.' Br. Opp. Wanner, 6.

Finally, Plaintiffs claim Defendant Wanner's assignment of HSA Okafor to watch Ms. Marcucci shocks the conscience because, "in light of Mr. Okafor's past performance, which included frequent abandonment of his duties, Mr. Okafor was undependable and unreliable and should not have been given the critical job of supervising Marie Marcucci during meals and snacks."  Pls.' Response to Def. Wanner's Statement of Undisputed Material Facts, ¶ 18 (citing Dep. of Marian Klepser, M.D., Pls.' Br. Opp. Wanner, Ex. E, 104-08).  Defendant Wanner rejoins that "HSA Okafor was assigned" to Ms. Marcucci and "knew the situation," and, like all of the monitors assigned by Defendant Wanner, HSA Okafor "knew the policy and precautions" in place at Ancora.  Def. Wanner's Reply, 2.  Moreover, even Ms. Gaddis testified that "procedures" aimed at protecting patients who posed choking risks were generally followed at Ancora.  Gaddis Dep., Pls.' Br. Opp. Wanner, Ex. M, 46-47.

Defendant Wanner's conduct—even if found by a jury to be extremely negligent—does not shock the conscience of the Court.  Importantly, the Supreme Court has underscored that "the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society . . . ."  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128, 112 S. Ct. 1061, 1070, 117 L. Ed. 2d 261 (1992) (internal quotation marks omitted).  The Third Circuit has explained, in a different context, that "[i]n light of the Supreme Court's unanimous adherence to the 'shocks the conscience' test in Collins, the reckless indifference of government employees is an insufficient basis upon which to ground their liability for a police pursuit under the Due Process Clause."

15

<u>Fagan v. City of Vineland</u>, 22 F.3d 1296, 1306 (3d Cir. 1994).  Moreover, "[n]egligently inflicted harm . . . is categorically beneath the threshold of constitutional due process and will never be conscience shocking."  <u>Evans v. Sec'y Pennsylvania Dept. of Corr.</u>, 645 F.3d 650, 660 (3d Cir. 2011), <u>cert. denied,</u> 132 S. Ct. 349, 181 L. Ed. 2d 220 (U.S. 2011).  Accordingly, it is clear that Defendant Wanner's conduct does not rise to conscience-shocking level, and her summary judgment motion is granted.

## IV.    CONCLUSION

For the foregoing reasons, the motion of Defendants Ancora and New Jersey is **GRANTED**.  The motion of Defendant Kargbo for summary judgment on Count 1 is **GRANTED**, as is Defendant Kargbo's motion for summary judgment on Plaintiffs' claim for punitive damages.  The summary judgment motion of Defendant Wanner on Count 1 is **GRANTED**.


Date: 6/22/2012                                           /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge